The Honorable Judge Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>  v.<br><br>SEAN WILLIAM DOAK,<br><br>              Defendant. | NO. CR08-244RSL<br><br>AMENDED DEFENDANT'S SENTENCING MEMORANDUM<br><br>**June 10th, 2016 at 9:00 a.m.** |

## I.   Introduction and Defendant's Recommendation

Mr. Doak accepted responsibility in this matter by entering a plea in a timely manner.[1]  The parties concur that Mr. Doak has a criminal history category of I, and his adjusted offense level is 40. Mr. Doak's advisory range of imprisonment is 292 - 365 months.  The parties have jointly agreed to recommend a sentence of at least 84 months, but not more than 96 months. [2]

---

[1] Mr. Doak pled guilty prior to the Government having to travel to Canada to retrieve evidence in this case, saving considerable time and money.
[2] Defense acknowledges a sentence of 84 – 96 months is a substantial departure from Mr. Doak's advisory range.

**DEFENDANT'S SENTENCING MEMORANDUM- 1**

**MICHELE SHAW**
Attorney at Law
2125 Western Ave #330
Seattle, WA 98121
Bus (206) 448-9612
Fax (206) 319-5473
michele@micheleshawlaw.com

Defense respectfully requests that the Court grant a variance based on Mr. Doak's history and characteristics, and sentence him to 84 months' imprisonment.  The proposed sentence will promote respect for the law, reflect the seriousness of the offense, and adequately deter Mr. Doak from engaging in future criminal conduct.

## II.  Criminal Conduct in Canada and Extradition Timeline

On May 31, 2007, when Mr. Doak was 33 years of age, he was convicted of *Conspiracy to Export Marijuana*.  It is Mr. Doak's only prior conviction.  Mr. Doak received a sentence of seven years, but was released on parole after serving 14 months.   Mr. Doak was placed back in custody a number of times during his period of supervision.  By the time his supervision was terminated, Mr. Doak had served a total of 28.5 months in custody and 10 months on day parole.

On March 5, 2009, while still on supervision for this Canadian offense, Mr. Doak became involved with this criminal conspiracy before the Court and was arrested.

On December 22, 2009, Mr. Doak was indicted in the Western District, with *Conspiracy with Intent to Distribute Controlled Substances*.   At the time, Mr. Doak weighed 471 pounds, and suffered from a debilitating knee injury sustained during a car accident when he was 15.  Mr. Doak's received vertical sleeve gastrectomy surgery on July 30, 2014 to address his weight issues, and arthroscopic surgery on his left knee on August 25, 2015 to address the pain in his knee.  **Exhibit A.**

From January of 2012 through October of 2015, Mr. Doak fought extradition from Canada to the United States, in part on the grounds that the U.S. Bureau of Prisons could not, or would not, accommodate Mr. Doak's medical conditions and provide him with vertical sleeve

**DEFENDANT'S SENTENCING**
**MEMORANDUM- 2**

**MICHELE SHAW**
Attorney at Law
2125 Western Ave #330
Seattle, WA 98121
Bus (206) 448-9612
Fax (206) 319-5473
michele@micheleshawlaw.com

gastrectomy surgery necessary for him to lose weight[3], and knee surgery necessary for him to walk without pain.

The following chart shows the timing of Mr. Doak's medical interventions *vis a vis* his extradition proceedings in Canada.

| Date | Legal Proceeding | Medical Treatment |
|------|------------------|-------------------|
| March 5, 2009 | Mr. Doak is arrested in Canada for the instant offense. | Mr. Doak weighs 471 pounds and is put on a waiting list for vertical sleeve gastrectomy surgery in Canada. |
| 2010 | Extradition proceedings not yet initiated by U.S. | Mr. Doak seeks treatment for severe knee pain.  Cannot fit into MRI due to obesity.  Must lose weight prior to appropriate diagnosis and treatment of knee. |
| Early 2011 | Extradition proceedings not yet initiated by U.S. | Mr. Doak is diagnosed with significant heart issues.  Still on waiting list for vertical sleeve gastrectomy surgery. |
| 1/12/2012 | U.S. requests extradition of Mr. Doak.  Mr. Doak opposes extradition, in part due to unresolved medical issues. | Mr. Doak awaiting vertical sleeve gastrectomy surgery and knee surgery. |
| April 5, 2012 – July 20, 2014 | Mr. Doak continues to oppose extradition, in part on medical grounds.  Extradition eventually appealed to the Canadian Supreme Court. | Mr. Doak awaiting vertical sleeve gastrectomy surgery. |
| July 30, 2014 | Mr. Doak continues to oppose extradition, in part on medical grounds. | Mr. Doak receives vertical sleeve gastrectomy surgery.  Waits to see if weight loss resolves issues with knee pain and digestion. |

---

[3] The U.S. Bureau of Prisons could not guarantee Mr. Doak that if he surrendered to U.S. authorities he would receive vertical sleeve gastrectomy surgery while in custody in the U.S.

**MICHELE SHAW**
Attorney at Law
2125 Western Ave #330
Seattle, WA 98121
Bus (206) 448-9612
Fax (206) 319-5473
michele@micheleshawlaw.com

| July 14, 2015 | Mr. Doak continues to oppose extradition, in part on medical grounds. | After losing more than 200 pounds, Mr. Doak has a cholecystectomy (removal of gall bladder) in attempt to address remaining digestion issues.  Digestion issues not resolved by removal of gall bladder. |
| August 25, 2015 | Mr. Doak continues to oppose extradition in part on medical grounds. | Mr. Doak has arthroscopic surgery on his left knee.  Operation does not completely resolve pain issues in knee. |
| October 2015 | Mr. Doak is ordered to surrender to the U.S. authorities after losing his final appeal to the Canadian Supreme Court. | Mr. Doak's knee and digestive issues remain unresolved. |

The Government avers that Mr. Doak used his medical condition as a pretense to extend his extradition proceedings, in an effort to avoid facing criminal charges in the United States. While Mr. Doak admits he was very anxious about serving a lengthy prison sentence in the U.S., it bears noting that Mr. Doak did receive each of the medical procedures he claimed he needed in his extradition proceedings. When he lost his final appeal on the extradition, Mr. Doak voluntarily turned himself into authorities to face charges in the U.S.

### III. 18 U.S.C. §3553

Sentencing courts must consider the advisory guidelines, the sentencing factors set forth in 18 U.S.C. §3553(a), and the dictate that the sentence be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

DEFENDANT'S SENTENCING
MEMORANDUM- 4

**MICHELE SHAW**
Attorney at Law
2125 Western Ave #330
Seattle, WA 98121
Bus (206) 448-9612
Fax (206) 319-5473
michele@micheleshawlaw.com

**A.  The history and characteristics of Mr. Doak warrant a departure from the advisory guideline range.**

Mr. Doak was born and raised in Canada.  At the age of eight his mother died of cancer. While growing up, his father, a chemical engineer, often had to leave Mr. Doak and his brother in the care of relatives when he traveled on business.

At the age of 15, Mr. Doak was severely injured in a car accident when a drunk driver struck the car in which he was a passenger.  Mr. Doak was thrown through the rear windshield and hit a cement park bench with such force it broke the bench.  Mr. Doak broke his ribs, hand, and right leg.  His pelvis was crushed.  He suffered internal bleeding, lost internal organ function, bruised his spine and had ten percent of the skin scraped off his body.  He was operated on five times and had to be taught how to walk again due to neurological damage he sustained.  He was lucky to have survived.  His father, William Doak, states that Mr. Doak was never quite the same person after having survived that car accident.

Though Mr. Doak did not complete high school[4] he furthered his education as an adult. In the mid-1990's he graduated from a two-year culinary arts program at the North Alberta Institute of Technology in Edmonton.  From 2007 – 2008 he completed one year of entry level electrical training through Comosan College.  In early 2012, Mr. Doak attended Okanagan College to finish his high school education.  He completed his 12th grade English course and nearly completed his 11th grade math courses as well.

---

[4] Mr. Doak is waiting to sit for his GED examination at the FDC.  He hopes to have the opportunity to take the test sometime before sentencing.

**DEFENDANT'S SENTENCING MEMORANDUM- 5**

**MICHELE SHAW**
Attorney at Law
2125 Western Ave #330
Seattle, WA 98121
Bus (206) 448-9612
Fax (206) 319-5473
michele@micheleshawlaw.com

Mr. Doak met his wife, Julie Sanregret, in 1996 and married in 1999. They had a son the following year. The couple separated in 2007 while Mr. Doak was in custody for his Canadian conviction, but the couple later reunited and remarried on New Year's Eve 2014.

During the time Mr. Doak and Ms. Sanregret were separated, Mr. Doak had a relationship with Julie Hudson, with whom he had a son on June 26, 2014. Mr. Doak also became the *de facto* father to Ms. Hudson's older boy by a different relationship. Though not Mr. Doak's biological child, Ms. Hudson's older son still calls Mr. Doak, "Dad," as Mr. Doak is the only father figure the child has ever known. Mr. Doak remains involved in all his children's lives.

Mr. Doak is very close to his father and step mother, William and Lovena Doak, who have been a solid foundation of support for Mr. Doak throughout this process. Prior to turning himself in, Mr. Doak was living in a mobile camper home on his father's property in Chilliwack, British Columbia, with his wife and oldest son. Mr. Doak's father and step-mother are in their 70's and are not in good health. Mr. Doak deeply regrets he will not be there for his parents as they get older and fears they may not live to see him get out of prison.

Mr. Doak's arrest on March 5, 2009 was a major wake up call for him. From that day forward, Mr. Doak has done everything in his power to turn his life around. Since his arrest, Mr. Doak has been completely law-abiding, devoted to his family, and committed to bettering his health. After losing over 200 pounds through gastric bypass surgery, Mr. Doak put himself back to work. In addition to being employed as a cook and a handyman at local resorts in British Columbia, Mr. Doak started his own business selling a healthy mayonnaise dip he

**MICHELE SHAW**
Attorney at Law
2125 Western Ave #330
Seattle, WA 98121
Bus (206) 448-9612
Fax (206) 319-5473
michele@micheleshawlaw.com

invented at local stores and farmers' markets.   Mr. Doak also returned to the church where he is an active member.  His evolution over the past seven years has been remarkable.

In Mr. Doak's own words:

"I recognize what led me down this path and I have taken steps to surround myself in positivity; church, employment, re-established my relationship with my parents, and noncriminal friends. I have found my sense of worthiness, acceptance, and sense of family through my children, wife, employment, and parents. For these reasons I have chosen to live a different life and have lost all interest in criminal activity." **Exhibit B** and **Exhibit C.**

**B.** **A seven-year sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence to criminal conduct, and protects the public from further crimes of the defendant.**

Over the past seven years, Mr. Doak has become a radically different person from the 35-year-old man who took part in this conspiracy.   Mr. Doak's humble and exemplary lifestyle demonstrate that he no longer needs to be deterred from engaging in criminal conduct, and the public no longer needs to be protected from him.  Being separated from his wife, children and aging parents will make Mr. Doak's punishment particularly difficult for him.

**C. Nature and Circumstances of the Offense.**

In his acceptance of responsibility, Mr. Doak states his involvement in this conspiracy was an angry reaction to what he perceived as unfair treatment while he was on parole in Canada.  Mr. Doak now realizes how foolish and destructive his thinking was.

Mr. Doak concedes he was a leader in this conspiracy. There is no allegation that any member of the conspiracy was armed, engaged in violence, or threatened the use of violence during the commission of the offense.

**DEFENDANT'S SENTENCING**
**MEMORANDUM- 7**

**MICHELE SHAW**
Attorney at Law
2125 Western Ave #330
Seattle, WA 98121
Bus (206) 448-9612
Fax (206) 319-5473
michele@micheleshawlaw.com

**D.  Educational or vocational training, medical care, and other correctional treatment.**

Mr. Doak is completing his GED at the FDC.  He has nearly finished his coursework and, as of the writing of this memorandum, Mr. Doak is very close to taking his final examination.  A graduate equivalency diploma will make Mr. Doak more employable when he is released from prison, and make it easier for him to engage in programs while in the Bureau of Prisons.  He looks forward to returning to work and providing for his family.

**E.  The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Six other members of the conspiracy have already been sentenced to prison terms ranging from 18-months (Lucretia James) to 120 months (Ross Legge).  Co-conspirator Leonard Ferris received 72 months, Wayne Coates received 60 months, Jeremy Snow received 46 months, and Adam Christian J. Serrano received 36 months.  An 84-month sentence for Mr. Doak would be the second longest sentence given to any of the co-conspirators in this case.


**IV.  <u>Mr. Doak no longer has the proceeds from drug trafficking</u>**

The Government and U.S. Probation have expressed concerns that Mr. Doak may have hidden assets from his past drug dealing.  Mr. Doak has emphatically denied he has any hidden assets.  Mr. Doak has signed releases the Government has presented so they can fully investigate his finances.

At one point Mr. Doak did acquire a large sum of money from dealing drugs.  Much of that money was lost in failed business ventures.  Some of the money was given to other individuals to use as down payments on four homes which were then used as marijuana grow operations, but Mr. Doak no longer has any financial interest in those properties.  During the

**MICHELE SHAW**
Attorney at Law
2125 Western Ave #330
Seattle, WA 98121
Bus (206) 448-9612
Fax (206) 319-5473
michele@micheleshawlaw.com

time he was producing marijuana, Mr. Doak had to pay double rent on 16 rental properties and hire individuals to run the grow operations. When Mr. Doak was arrested and prosecuted, his remaining assets from the drug dealing were lost.

## V.  Conclusion

Mr. Doak respectfully requests that the Court grant him a variance, and sentence him to 84 months of confinement. Mr. Doak is very appreciative of the Government's position.


DATED this 2nd day of June, 2016.

Respectfully Submitted,

  s/ Michele Shaw
MICHELE SHAW, WSBA #19561
Law Office of Michele Shaw
2125Western Ave., #330
Seattle, WA 98121
Telephone: (206) 448-9612
Fax: (206) 319-5473
Email: michele@micheleshawlaw.com

**DEFENDANT'S SENTENCING**
**MEMORANDUM- 9**

**MICHELE SHAW**
Attorney at Law
2125 Western Ave #330
Seattle, WA 98121
Bus (206) 448-9612
Fax (206) 319-5473
michele@micheleshawlaw.com

1

2

## <u>CERTIFICATE OF SERVICE</u>

3      I HEREBY CERTIFY that on this day, I electronically filed the foregoing pleading with

4 the Clerk of the Court using the CM/ECF system which will send notification of such filing to

5 the attorney(s) of record for the defendant(s). I hereby certify that I have served any other parties

6 of record that are non CM/ECF participants via tele-fax/U.S. postal mail.

7      DATED this 7th day of June, 2016.

8

9                                                 s/ Sienna Wakatsuki
                                              Sienna Wakatsuki, Legal Assistant
10                                             Law Offices of Michele Shaw, #19561
                                              2125 Western Ave., #330
11                                             Seattle, WA 98121
                                              Phone: (206) 448-9612
12                                             Facsimile: (206) 319-5473
                                              sienna@micheleshawlaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25

**DEFENDANT'S SENTENCING**                          **MICHELE SHAW**
**MEMORANDUM- 10**                                   Attorney at Law
                                                  2125 Western Ave #330
                                                  Seattle, WA 98121
                                                  Bus (206) 448-9612
                                                  Fax (206) 319-5473
                                                  michele@micheleshawlaw.com

Dr Stephen Wright
Box 247
Lumby V0E 2G0
250-547-2127

Re: Sean Doak
DOB: 18 February 1974
PHN: 9864-902-348

9th March 2016

Dear Ms Shaw,

Thank you for your letter of the 26th January 2016 requesting medical information on this gentleman.

**Qualifications**
My name is Dr Stephen John Wright. I am a family physician, with an office based practice, in Lumby British Columbia. My qualifications include MB,ChB from Leicester University in the United Kingdom. I am a member of the Royal College of General Practitioners (MRCGP). I have the LMCC and the CCFP designations. I am a member, in good standing, of the College of Physicians and Surgeons of British Columbia. I have certification in Practical Dermatology from Cardiff University, Wales. I have been a family physician since 1990, working initially in England, and then emigrating to Canada in 2009.

**Instructions**
I have been asked to prepare a report for Mr. Sean Doak. The purpose of this report is to aid the sentencing Judge, US Probation, and to the Bureau of Prison who will use it for their care of Mr. Doak whilst he is in custody.

I have been asked to provide dates of any surgeries or other medical interventions (ie. Gastric bypass, knee surgery). To provide an explanation as to why these procedures were medically necessary (ie. Strain to Mr. Doak's heart and/or any other health related issues). To comment on the medical care that followed the operations and to list all the medications Mr. Doak has been on.

**Report of Medical Issues**

I can confirm that I have been Mr. Doak's family physician since March 2011. This gentleman has a number of medical issues. He gives a history of a motor vehicle accident resulting in multiple fractures, although I believe this was some time in the distant past. He has chronic back pains which may relate to that. He has a history of asthma and has needed inhalers to manage it. He has sleep apnoea which has been proven by objective testing. It is essential that he continues to use a 'CPAP machine' overnight, to maintain his oxygen levels. Failure to use this machine may result in cardiac stress.

He had an arthroscopic surgery on the left knee on 25th August 2015, which confirmed a lateral menisceal tear. This was debrided with good results. This is on a background of early arthritic changes.

Mr Doak has suffered with morbid obesity and has had a vertical sleeve gastrectomy on July 30th 2014. This is a procedure designed to help with weight reduction. There are some long term management requirements as a result of this.

He has had a cholecystectomy (removal of gall bladder) on July 14th 2015. This was for recurrent abdominal pains dues to gall bladder disease. He has had issues with post cholecystectomy diarrhea. In addition, he has gastroesophageal erosions and reflux disease.

He has had significant cardiac problems. It is likely that he had an inferior myocardial infarction (heart attack) at some point in the past. He has had significant cardiomyopathy which has been under specialist follow up. He is on a number of medications to maintain and improve heart function. They should be continued.

He had a cystoscopy on 7th August 2012 which confirmed a mild urethral stricture. It is possible he may develop further problems with urination. If this occurs, he may need to see a urology specialist for reassessment.

In addition to his physical problems, Mr. Doak has suffered with anxiety and depression for which he has taken medication.

**Recommendations**

Mr Doak has had a gastric sleeve fitted as part of his weight management program. He requires vitamin supplements including Vitamin B12 supplement and Vitamin D supplement. He needs to carefully monitor his calorie and protein intake. He has been seeing a dietician as part of this, and having a yearly follow up with his bariatric surgeon. Ideally this should continue.

He has significant cardiac problems, although with his weight reduction there has been an improvement in his heart function. His medications should be continued. He should aim for further weight reduction, combined with an ongoing aerobic exercise program. A yearly cardiology review, and possibly further echocardiograms, would be recommended. Monitoring of his weight and blood pressure, on a 3 monthly basis, would be routine with this.

He should continue with his CPAP treatment whilst he is incarcerated. This requires the use of a machine and the wearing of a mask/ device overnight. Failure to do this could be detrimental to his health. He may develop exacerbation of his heart problems if this is neglected.

He should have regular blood testing, as part of his ongoing monitoring of the conditions mentioned. I would recommend full blood count, urea, electrolytes, creatinine, glomerular filtration rate, HbA1c, fasting glucose, lipid panel, Calcium, Magnesium, liver function tests, protein, albumin, lipase, Vitamin D and Vitamin B on an annual basis, as a minimum.

I recommend continuing with his current medications. He is at risk of developing further medical problems. It would be sensible for him to have regular check-ups with a physician. An annual complete physical examination would be expected as part of the monitoring process. Referral on to secondary care if there are significant changes to pre-existing problems, or if significant new problems develop, would also be expected.

I would also recommend providing a full copy of his medical charts to the physician that is responsible for his medical care, whilst he is incarcerated. These can be obtained from my office if requested.

That concludes my report.

Yours sincerely,

Dr. S. J. Wright
M.B.,Ch.B., M.R.C.G.P., CCFP
Diploma in Practical Dermatology

Attachments: -

1.Medication list
2.Profile List

**Dr. Stephen Wright**
Lumby Medical Clinic
PO Box 247, 2135 Norris Ave.
Lumby, BC V0E 2G0
PHONE: () 250-547-2127 FAX: () 250-547-2196

## Medication List

**Sean Doak**
244 Stepping Stone Cres
Vernon, BC V1H 1X2
(250) 307-4034 |

PHN: 9864902348  Chart#:
DOB: 18-Feb-1974  Age: 42 yrs
Gender: M
Provider: Dr. Stephen Wright

### Medications

**Active**

| Usage | Name | Dosage Info | PRN | Qty | Ref | Dates | Status |
|-------|------|-------------|-----|-----|-----|-------|--------|
| Continuous | ADVAIR 250-25 MCG INHALER | 2 Puffs, BID | | 2 | 0 | 25Sep15-24Dec15 | Approved |
| Continuous | AMITRIPTYLINE HCL 10 mg TABLET | 2 Tablet(s), QHS | | 60 | 0 | 19Aug15-18Sep15 | Approved |
| Continuous | ASA 81 MG TABLET EC | 1 Tablet(s), QD | | 90 | 0 | 01Mar15-30May15 | Approved |
| Continuous | ATORVASTATIN CALCIUM 40 mg TABLET | 1 Tablet(s), QD | | 90 | 0 | 17Nov15-15Feb16 | Approved |
| Continuous | CARVEDILOL 25 mg TABLET | 1 Tablet(s), BID | | 180 | 0 | 17Nov15-15Feb16 | Approved |
| Continuous | CITALOPRAM HYDROBROMIDE 20 mg TABLET | 1 Tablet(s), QD | | 30 | 0 | 19Aug15-18Sep15 | Approved |
| Continuous | CYCLOBENZAPRINE HCL 10 mg TABLET | 1 Tablet(s), TID | | 270 | 0 | 17Nov15-15Feb16 | Approved |
| Continuous | DIMENHYDRINATE 15 mg TABLET | 1-2 Tablet(s), QID | | 160 | 0 | 19Jun15-09Jul15 | Approved |
| Continuous | FUROSEMIDE 40 mg TABLET | 1 Tablet(s), QD | | 30 | 0 | 19Jun15-19Jul15 | Approved |
| Continuous | GABAPENTIN 300 mg CAPSULE (HARD, SOFT, ETC.) | 3 Capsule(s), TID | | 810 | 0 | 17Sep15-16Dec15 | Approved |
| Continuous | RAMIPRIL 10 mg CAPSULE (HARD, SOFT, ETC.) | 1 Capsule(s), QD | | 90 | 0 | 17Nov15-15Feb16 | Approved |
| Continuous | SALBUTAMOL SULFATE 100 mcg AEROSOL (GRAM) | 2 Spray(s), QID | | 3 | 0 | 25Sep15-24Dec15 | Approved |
| Continuous | TECTA 40 MG TABLET EC | 1 Tablet(s), QD | | 90 | 0 | 17Nov15-15Feb16 | Approved |

---

**Exhibit A**
**Page 14**

## Profile List
### Sean Doak,
### Ins #: ,
### Age: 42 years,
### Phone: ("250")
### 307-4034

| Category | Status | Date | Type | Description | Note | Severity | Updated |
|---|---|---|---|---|---|---|---|
| Care Plan | Current | | | *Dec29/14-CC-033-Yes email | | | 07Oct15 |
| Care Plan | Current | | | *Outstanding bills from Jun2011 totaling $60000 | | | 11Oct12 |
| Care Plan | Current | | | *Transferred to DR. Green in Courtenay Medical | | | 01Aug14 |
| Medical | Current | | | Asthma nos* | | | 24Jan14 |
| Medical | Current | | | Cardiomyopathy* | | | 24Jan14 |
| Medical | Current | | | Chronic back pain | | | 24Jan14 |
| Medical | Current | | | Hypersomni w sleep apnea- CPAP | | | 29Oct14 |
| Medical | Current | | | Letter service canada | | | 24Jan14 |
| Medical | Current | | | Morbid obesity | | | 24Jan14 |
| Medical | Current | | | Motor vehicle accident multiple fractures | | | 24Jan14 |
| Surgical Hx | Current | 2014 | | Gastric sleeve | | | 04Sep14 |
| Surgical Hx | Past | 14Jul15 | | cholecystectomy 2015 | | | 15Jul15 |
| Surgical Hx | Past | 2012 | | oth sprf dsdr urethra- stricture | | | 26Jun14 |
| Lifestyle | Current | | Alcohol | Excess- stopped 1996 | | | 12Dec11 |
| Lifestyle | Current | | Drug Use | Cocaine use stopped 2005 | | | 12Dec11 |
| Lifestyle | Past | | Smoking | Past History of Smoking | | | 29Sep14 |

Page 1

Exhibit A
Page 15

January 27, 2016

Dear Judge Lasnik,

I have no excuse for what I have done. I would like to offer you a historical perspective of my life leading to the person I was and then to the person I am today that I have worked so hard to become post March 5th, 2009.

When I was eight years old I watched my mom deteriorate from cancer until she passed away when I was ten. My father is a great man with extreme intelligence and strong Christian values; however, sometimes with extreme intelligence, social and communication skills lack. Subsequent to my mother's death my father traveled on regular business trips for his work as a Chemical Engineer. These trips were sometimes two weeks out of a month. I felt lonely as a child. While my dad was on business trips, my brother and I were left under the care of my Grandfather or my eldest brother, who was fourteen years older than me. My eldest brother could be the nicest guy you ever met and almost instantly transform to hitting, screaming and pushing. He would ask us to come stay with him and once we were there he would lose control over almost anything and scream and hit us. He would apologize and we would forgive him. We idolized and looked up to him, so we continued to want to be near him but yet we were terrified of him. This continued until we became adults.

A couple months after turning fifteen, I was a passenger in a vehicle that was hit by a drunk driver. I was thrown out of the rear of the vehicle and my body smashed a cement and wood park bench. I suffered a broken right leg, crushed right pelvis, fractured ribs, internal bleeding, bleeding from my left ear, loss of internal organ function, fractured hand, bruised spine, loss of teeth, countless stitches in my mouth and on my body, and approximately ten percent of my skin scraped off. I was in intensive care for weeks. I had to relearn to walk. I received five surgeries as a result of this accident. After discharge from the hospital I had to retrain my brain, maintain balance and coordinate movements. My neurologist diagnosed me with brain damage. To this day my father says I changed as a result of this accident.

Throughout these events I lost my need for acceptance, love, nurturing, worthiness, and sense of family. During my criminal endeavors I was surrounded by people who I believed wanted and needed me. I believed that others would have a harder time without me.

In late November 2009 I was breached by the Community Parole Office for cocaine use. I became angry with the Community Parole Office for not signing me out on the breach because I watched others receive numerous opportunities. I dwelled on this and my anger increased as I awaited six weeks for the parole board to decide if they would release me. I planned what I could do to get back at them for this. Ultimately, I was released after the six weeks, this is when I involved myself in this offense. I am so ashamed that I fell into that irresponsible thought process. I ended all involvement in any criminal activity in March of 2009.

In 2009, I began a romantic relationship with a care aid and we lived together in Chilliwack, BC. In January 2010, I was breached by the Community Parole Office as a result of them verifying my indictment in the USA. I was incarcerated until late November 2010, when the National Parole Boards Appeals Division overturned my revocation. During that incarceration, my home went into foreclosure for the second time and was sold for what was owed. This was my final attachment to the place where my criminal associates were. Upon this release, I decided to move with my common-law wife near my parents in Vernon, BC (3.5 hours from Chilliwack). In early 2011 I was 450 pounds and diagnosed with an enlarged heart. I was granted Person With Disability status. I was unable to physically work and was not educated for non-physical work. I suffered depression and took advantage of the resources available to me and met with the Parole Psychologist. I had several meetings over a matter of months. With the encouragement of the psychologist I decided to upgrade my education and move towards a non-physical career. In early 2012, I attended the Okanagan College and enrolled in Computers 11 and English 12. I also enrolled at the Vernon Open Door and achieved advanced grade 11 math. Prior to completing the English twelve at the College the extradition had made its way across to Canada. I was arrested and then bailed after three weeks. The College allowed me to complete the English 12 course.

In 2012, prior to the extradition arrest I attended a Vegan Health Retreat (Silver Hills Guest House) for five days. While I was there, I demonstrated a healthy Vegan Mayonnaise I created in the past; everyone at the retreat was excited about its simplicity and good taste. The owner of the retreat requested I come back and demonstrate it at his monthly sessions. The owner strongly encouraged me to make this a business. I took his encouragement and built a kitchen in an enclosed trailer. By mid-August 2012 I was able to have this Health Authority inspected and approved. I began selling a series of Vegan Dips and Mayonnaise in mid-August 2012 at the Farmers Market. By the summer of 2013 I secured approximately thirty stores selling my products throughout the Okanagan. I demonstrated my products at the stores and Markets, an average of three times a week.

I attended General Physician and specialist appointments on a regular basis. I was able to achieve a Gastric Sleeve surgery after nearly five years on a wait list. I was able to have a knee surgery to improve my mobility. On June 26, 2014 my second son was born. In the Summer of 2015 my business had significantly dwindled due to the fact that the majority of the stores were not selling my products unless I was demonstrating them. By now I had lost enough weight that I felt I could achieve physical work again. I acquired work with a lady, finishing a home, that her and her boyfriend owned. She also had work at a five cabin resort at Sulphurous Lake, BC that they owned. I was not able to attend the Resort to work because I was hired at Sparkling Hills Resort (the most prestigious hotel in the Okanagan) as a first cook. This is where I was working when I was required to surrender for this extradition.

For the fourteen months prior to my extradition, due to financial difficulties and the circumstances of this charge, my best option was to live in an RV on my parents' property. This was a seven-hour drive and a two-hour ferry ride from my two youngest children. Every four to six weeks I would travel to be with them. I took them camping three times this last summer. I

2

took my youngest on his first go cart ride. I paid child support every month. While on a near poverty level pay, I ensured they had birthday and Christmas presents from me. Even with this incarceration coming I saved $100.00 for each kid for Christmas. I paid travel in both directions for my eleven-year-old to be with me on Christmas, Easter and this last summer. I have made my eldest son aware that at any time he may need a ride, night or day, he can depend on me. My kids are good respectful kids. I am a good dad and I will do anything to ensure my kids best interest. I constantly encourage College or University. I make them aware that I love and support their best interest always. I am adamant with my kids about the negative effects of drug usage. I am open about my past and educate them about where criminal life leads. My oldest son was failing Math last year with a 37%. In the last seven weeks of the semester I spent two hours a day with him and he was able to raise his mark to a pass.

I have struggled with almost no money over the last years since this offense, and I have struggled with life threatening medical issues. I have struggled with depression as a result of the health issues and charges combined. I successfully achieved the remainder of nearly four years' parole in Vernon, BC., under vigorous questioning bi-weekly, home visits, producing bank statements, urine analysis, fifty kilometer traveling radius, using only one phone, and producing phone records for that phone. I signed in at the RCMP station monthly until the end of Parole in May 2014. I built and maintained excellent trusting relationships with the Parole Office, and the Parole Psychologist. All monitoring was a 100% success post March 5, 2009.

I have done a major soul search on who I want to be, what acceptable behavior is for me, and what I am ok with teaching my children. Life's answers never come instantly; however, strong overpowering desires drive change. I am incredibly fortunate to have the support of my family after everything I have put them through. Every day I feel the pain of realizing my oldest son will graduate without his father there; my youngest son will start walking and talking without his father; my eleven-year-old son will go through puberty and his most impressionable time without a dad. I will never be able to give this back to my children. My wife is now alone trying to exist for herself, our son, and me. Due to financial struggles and the mother of my youngest two children not wanting our kids to enter a prison environment again, my wife and two youngest children are not going to be able to see me until I am back home. My parents are seventy-four and seventy-six, suffering heart problems, arthritis, and other mobility impairments, and I am unable to help them. The predicament I have left my family in saddens me and weighs heavy on my heart. The thought of my parents not being around when I am released tortures me daily and has for the past seven years. I recognize what led me down this path and I have taken steps to surround myself in positivity; church, employment, re-established relationship with my parents, and noncriminal friends. I have found my sense of worthiness, acceptance, and sense of family through my children, wife, employment, and parents. For these reasons I have chosen to live a different life and have lost all interest in criminal activity.

I accept that my prior breach was my doing and all other punishments I have and will receive is my doing. I made arrangements to plead guilty prior to discovery being released to me. I have lived with the burden of my wrong doings every day since March 5th, 2009. The burden has

been heavy and I hope to let it go when this discipline is finalized. I recognize how bad it looks and is that I reoffended while on parole. This was a relapse in my criminal addiction and I am sorry for this.

Your Honor, with the greatest of humility that I can portray, I ask that you consider who I am today and understand that I no longer pose any threat to society. I hope you allow me to reunite with my family soon and continue to be a father, husband, and son.

With the utmost respect,

Sean Doak

4

May 12, 2016

Dear Judge Lasnik:

My name is William Gerald Doak and Sean is my son. I am a chemical engineer with a Master's in Business Administration. I was employed with the Dow Chemical Company for twenty five years until I retired in 1996.

I have published a management book entitled "Managing Improvement." I also developed and wrote a number of training courses – two of which are as follows: Helping Others Resolve Issues through Coaching And Reaching Shared Meaning (Through Listening)

I taught these courses both within the company I worked for and to Church Leadership.

**Who is Sean William Doak?**

When my first wife died in 1984 I was left to raise two sons, Chris & Sean Doak, while maintaining a full time career with Dow Chemical. Fortunately, my father moved in with us as his wife, my mother, died just six months prior to the death of my wife. He was available to supervise the boys as my job required that I travel a lot.

Both boys were very active in hockey and this required a lot of travel time, both during the week and on weekends. Both boys also attended the Lamont Alliance church with me up until the age of 15. I was also a Bible study leader in the church.

I think it is appropriate to gain some understanding of who Sean is as a person and not just as someone who has committed a crime.

Sean, when he was young, was a timid, gentle boy, always wanting to please. Sean did well in school right up to grade eleven. He was no problem to his teachers or to his parents and was always a well behaved boy. Sean's mother and paternal grandmother both died of ovarian cancer when he was ten. Sean and his brother had to learn to cook and do house work as their father (myself) had a career with a large multinational company and had to travel frequently. The boys were left in the care of their grandfather during these times of their father's absence.

At the age of fifteen Sean was involved in a horrific accident wherein a drunk driver ran into a vehicle he was traveling in. Sean was thrown from the car and slammed into a concrete bench which was broken due to his impact. Sean was in intensive care for weeks and had to undergo a number of surgeries to save his life. Medical care had to be continued for more than a year after the accident wherein in continued to receive treatment, pain killers and additional surgeries. These injuries continue to plague him until this very day. After the accident Sean went into a serious deep depression and his personality changed. He became more involved in drugs and alcohol and he was having difficulty figuring out what was important in his life. Sean was never a violent person and even during these troubling times he did not commit any violent actions against anyone.

Page 1 of 3

**Exhibit C**
 **Page 20**

Soon after this he became involved with marijuana and he decided to move to British Columbia where he got even more involved. I personally do not believe that greed or money was ever the prime motivator for what he did. He liked the "wheeling and dealing" and from some distorted point of view he thought he was helping his friends to have lots of money and this gave him a good feeling.

Sean was always taking in those who had trouble sorting out their lives and in particular two children from one of his wife's sisters who was a drug addict. He raised these children as if they were his own and they still love him.

My second wife and I did not like the life style that Sean chose and he knew this and therefore did not discuss it with us. As his father my prayers were never that he would not be caught or that he would not go to jail. My desire was always that he would quit what he was doing and I was ok with whatever it took to accomplish this. When he was finally caught and incarcerated I noticed a dramatic change in his attitude. The harshness of being in prison, the loss of freedom and the stress of the lifestyle was starting to take its toll and I could see this change in him. As is typical of many of those who live this lifestyle he did not have any money saved and he subsequently lost his home. Due to all the stress he and his wife divorced.

After his last release on parole in late 2009 early 2010 Sean moved to Vernon to be close to his parents. Sean completely transformed his life. He stopped all association with those from his criminal past.

Sean in his later years had become significantly obese, and along with lingering problems from his first accident his health had deteriorated to the point where he could do little or no work. He was in pain essentially every day and was a frequent visitor to the emergency clinic at the hospital. His doctor detected that he must have suffered a heart attack at some point in time (a fact that he was not aware of). This was confirmed by a heart specialist and it was determined that he had an enlarged heart. His extraction rate was 50% of normal and if something radical wasn't done in regard to his excess weight, his life expectancy was going to be very short. During all this he was informed that the United States was seeking his extradition which added considerable stress to what he was going through. The doctors were recommending gastric bypass surgery as a means to prolonging his life. In Canada there is a significant wait list for this surgery and Sean could not be immediately operated on. Sean was convinced that if he was extradited that he would not get this life saving surgery in the United States and he would surely not make it back to Canada alive.

After about a two year wait Sean finally received the bypass surgery and Sean has subsequently lost a large amount of weight and is feeling much healthier. Subsequent tests on his heart have shown an improvement in his extraction rate, but the rate is still significantly less than that of a normal person and thus his life expectancy is also less.

Sean has never shown a propensity for violence and is well liked by all who know him.

Sean has shown a complete transformation in his life. He re-married his ex-wife and he and she, along with their son, lived on my property for the last two years. All Sean wants to do is live at peace and raise his family. He recently confided in me saying "When I was in the business I did not think I would ever be caught, however, in hindsight I have come to realize that it was not whether or not I would be

Page 2 of 3

Exhibit C
Page 21

caught, but when." In addition, he also confided that these last few years had been the happiest in his life, this in spite of health problems and having essentially no money except that provided by his disability cheque from the government. Shortly before his arrest in this matter, he acquired a job as a cook at a prestigious hotel just outside the town of Vernon. They were very happy to have him there in terms of his manner and his performance.

My wife and I are fully aware of the seriousness of the charges for which Sean will be sentenced. Sean has been living close to us since his release on parole and during all the extradition proceedings. Sean has had and will continue to have our full support in his transition to a new life.


Sincerely,

*W. G Doak*

William G. Doak
Sean's father


Page 3 of 3

**Exhibit C**
**Page 22**

May 12, 2016

Dear Judge Lasnik:

My name is Julie Sanregret and I am Sean's wife.

Sean and I met at the young age of fourteen in the small town of Lamont, Alberta, Canada. Sean was nineteen. He was a hard working young man who was employed by a local farmer. Sean had a very serious motor vehicle accident and received a settlement in 1998. This was when we decided to move to British Columbia, Canada.   This was also when we got married and started a family.

I suspected that Sean was involved in the drug business and this resulted in numerous arguments between us.  I was not party to his drug business and he did not discuss it with me. At this point in time Sean decided to lease a laundromat where I spent most of my time.   In 2001 Sean invested in a night club in Vancouver, BC, Canada.   His businesses were unsuccessful and resulted in a significant financial loss.

Sean was charged with trafficking in drugs in 2001 and from this point of time onward was a steady downward spiral financially and emotionally.  Sean lost all of his money, both in bad business deals as well as in paying lawyer fees.    Shortly after this the banks started to foreclose on our house.   The house had to be sold and we received very little in return.  After all the bills I received $100 from the sale.  We separated in 2007 and I moved to Alberta.  We subsequently divorced.

Sean was finally convicted and sentenced in 2007.  From this point on we had limited contact except for conversations in regard to our son, B███████.    Sean was never able to pay me child support, so we both agreed on B██████'s living arrangement.   We alternated living arrangements from year to year.  One year with me and one year with Sean.  We alternated who received child support from the government.  As the years went by I noticed from our conversations that Sean's attitude was changing.   I sensed that he genuinely wanted to escape from his previous life of crime.  All he wanted to do was get on with his life and focus on his family and making a good honest, crime free living.

In 2014 Sean and I reunited in Vernon, BC, Canada and were remarried in Dec. 2015.  Due to the fact that both he and I were on disability we were forced to live in a trailer on Sean's parent's acreage.  We had to live on a very meagre income.

Sean's health was in very poor condition.  Sean suffers from numerous aches and pains due to his car accident, as well a chronic heart problem wherein he has an extraction rate that is half that of a normal person.  He was in and out of emergency almost every week at one point.   In addition Sean was extremely obese and was waiting for gastric bypass surgery.  Since then he received this surgery and his health has greatly improved.   Since his health improved he was able to find employment in the food industry which is his passion.   He also did some work for Lindsay Zagar who owns a resort and she has indicated that she more than willing to take Sean

1

Exhibit C
Page 23

back.  During this same period Sean had invented a vegan food "dip", which he sold at farmer's markets and local businesses.   We were well on way to being able to move into our own place and finally start a brand new exciting life.

I can say with the upmost certainty that Sean has no money.  We live a very meagre life.   I have to admit that we are happier than we have ever been.

Sean and I had found a home for us in which B▇▇▇▇ and I live now.  I am now employed at the same high end resort where Sean was working.

We love Sean very much and we will continue to support and love him through this process.

Yours most sincerely,

Julie Sanregret

Exhibit C
Page 24

May 12, 2016

Dear Judge Lasnik:

My name is B██████ D██ and I am Sean Doak's son.

My dad is a very caring person.  I truly believe that he has always wanted the best for me.  Although I know he has been charged with selling drugs, he has always strongly discouraged me from becoming involved.   He is very concerned about my schooling and does whatever he can to ensure that I do the best that I am capable of.   For example when I was struggling in math he spent hours coaching me.

During the time when my dad was incarcerated we were very short of money.   Our house was being foreclosed on by the bank and it became necessary for me to live with my uncle and after that with my grandparents.   After my dad was released on parole we moved to Vernon to live close to my grandparents.  We lived in a trailer park and I alternated living with my mother in Alberta and my dad in Vernon from year to year.

My dad and mother remarried in Dec. 2015.  This made me very happy.  I finally felt that I had some stability in my life.  We were a family again.

My dad has cut all ties to his former life and never talks about it.   The saddest thing about all this is that everything was starting to really work out for us when this US extradition happened.   My dad got a job as a cook at a very high end hotel and was doing very well.  We were able to find a very nice place to live in an assisted rental townhouse.

My dad is a very creative person and if he had an objective he is very motivated in accomplishing it.  Every day he was working with my Grandfather in the shop and doing things around the house.   He was always inventing new food dishes.

Excluding the fact that he sold drugs, he is a very good role model and one of the most intelligent people that I know.

Yours most sincerely,





1

**Exhibit C**
**Page 25**

May 12, 2016

Dear Judge ,

I am Sean William Doak's sister-in-law.  I am a Kindergarten Teacher and mother of two.  I have known Sean for two and a half years.  I first met him when I began a personal relationship with his brother.  I have spent quality time with Sean on numerous occasions over the past two and a half years.  We have spent many hours discussing life and the choices we have made throughout ours.  I have had the fortune to watch Sean interact with his children and my children.  I think very highly of Sean and feel very blessed to have met him and to have him in my life and my family's life.

Sean William Doak is a hard working, loyal, honest, kind and loving man.  He has a big heart, which is very evident when you see him interact with all of his family. Sean works very hard to support his family.  He has a talent for cooking and has used this talent to start a business making dips, dressings, butters, and soaps.  I have witnessed Sean as a role model and positive influence in his children's lives.  He has spent numerous hours doing schoolwork with his oldest son and spending quality time with all of his boys.  When I first heard about Sean's criminal past, I made instant judgments about who I thought he was going to be.  Upon meeting Sean, I knew that the judgments I had made did not fit the man I was meeting.  I had a very difficult time making the image of Sean as a "criminal" match the person I was meeting.  I instantly felt comfortable with Sean and became very fond of him.

Exhibit C
Page 26

I have watched Sean struggle with very little financially over the past two and a half years. He has worked really hard, at numerous odd jobs, to be able to provide for his family in an honest manner. I have become very close to Sean and spent a lot of time with him. I have never seen Sean relapse into actions of his criminal past. He has put himself on the high road through hard work, personally and professionally, and has done everything in his power to remain there. I have watched him turn himself in numerous times, always on time and without incident. I truly believe that Sean is remorseful for his actions in his past and will not fall back into that lifestyle. I have visited Sean on a couple of occasions while in-custody and plan to continue to visit and stay in close contact with Sean throughout his time in-custody. Upon Sean's release, I will be there for him in any way he needs. He is my family and I will help him continue to follow the right path and have the most positive, honest life possible.

Sincerely,

Tracy Vriend

Exhibit C
Page 27

Dear Judge Lasnik,

Hello, my name is Donald McDuff I am a partner of "Triple C's Appliance Service" A small business based in Vernon B.C CANADA. I met Mr. Sean Doak almost 5 years ago. In the time I have known Mr. Doak, I have seen an amazing mind at work. I have witnessed his determination and ingenuity when it came to his small business creating, and marketing healthy dips, and dressings.

Sean has been a very positive person since the day we met, despite his dismal financial situation, and health issues he has faced. Sean has been on a disability claim as long as I have known him, since his gastric bypass surgery I have noticed he has more energy, and tends to work even harder.

In the time I have had the pleasure of knowing Mr. Doak, time, and time again he has proven to be an amazing father to his biological and non-biological children. Mr. Doak would make a number of trips to Vancouver Island to spend time with his newest son J██, and his stepson ██. Sean has Raised, a Great young man with his son B███ Consistently reminding him of the dangers of drugs, and how it can obviously affect your future. He has shown the utmost respect, compassion, and honesty to all those who have met him. Never once Has Mr. Doak betrayed my trust, or ever gave me a reason not to trust him. Within hours of meeting Sean he deemed it a necessity to explain his situation. Just to be sure that there was no secrets looming as our children became great friends.

I have not once witnessed Mr. Doak display any actions that would be indicative of his past. Nor has he ever given me reason not to believe with all my persons that he has been a model citizen the entire time I have known him. He has been nothing but the most honest, and dependable person I know to this day. Mr. Doak is a person one could always rely on for help with almost anything, or sound advice on most any topics. He is an extraordinary person. I am proud to call him a friend, and I would be willing to do anything to help him.

Sincerely yours,


Donald McDuff

Exhibit C
Page 28

May 12, 2016

Dear Judge Lasnik;

My name is Lindsey Zagar. I am a 36-year-old female. I live in the province of British Columbia, Canada in the Cariboo County. I have 3 daughters between the ages of 8-12. I am the operator and general manager of the Sulphurous Lake Resort. I have been employed here since the opening day in June 2014. I have a Rieki 1 level degree and also offer holistic healing in my home.

I have known the accused Sean William Doak since approximately 1996. Sean and I resided in the same small town and attended the Lamont Jr./Sr. High School, located in Lamont, AB. Sean at the time had been dating his current wife Julie Sanregret. As their love grew over the years Sean asked for Julie's hand in marriage. Sean was very proud to be a husband but was unbelievably proud when he heard the news he was going to be a dad. Fatherhood brought out many positive qualities in Sean. To this day Sean is extremely involved with his son's day to day living and life. Sean and his son B███ have a strong bond. I believe this bond is due to Sean's dedication, and attentiveness to his sons need in life on a daily basis. Sean has been extremely present in his son B███'s life for 16 solid years.

Since Sean has been accused I have seen him work in hard to become the family man and man he was always destined to be. I understand Sean has made mistakes in the past but I have seen him go in great lengths to show his remorse for his prior actions and to his future goals. He continues to amaze me with his strength to prove he has made changes to live a full honorable lifestyle and life.

Sean has always wanted to become a chef and has schooling for this career. Sean recently was offered a position as a chef at a prestigious hotel. He is very proud to be able to exercise the knowledge he has gained from his schooling. Sean was also providing for his family through this employment. Sean is 100% a family man. His foremost goal is to be there for his wife and son as a husband and father. Through his natural talent of cooking I have no doubt in my mind Sean would be able to fully provide for his family in this manner.

Since Sean has been charged and awaited his sentencing through the U.S. Judicial System, I know Sean to only be an upstanding citizen, following all laws and orders presented to him. He continues to be hopeful and positive through this very complicated matter. Sean has taught even me the meaning of hope and deep regrets of past mistakes. Sean has a great heart and wants to love and be a fantastic husband, son and citizen of Canada. I believe Sean would make a fantastic role model for others who have made mistakes and want change.

**Exhibit C**
**Page 29**

Sean is a very gentle man. He has a big desire to watch his 1st son complete school and be available for his 2nd son. Sean often speaks about his fear of not being available for his children and they should not suffer for the mistakes he has done. Sean has made every attempt to fix his mistakes and has proved this by staying out of trouble.

Lindsey Zagar

**Exhibit C**
**Page 30**